[Cite as *State v. Kuritar*, 2012-Ohio-3849.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 24875 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2010-CRB-2048 |
| v. | : | |
| | : | |
| KEVIN KURITAR | : | (Criminal Appeal from Montgomery |
| | : | County Municipal Court-Eastern |
| | : | Division) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

<u>O P I N I O N</u>

Rendered on the 24th day of August, 2012.

. . . . . . . . . . .

RYAN BRUNK, Atty. Reg. #0079237, 125 West Main Street, New Lebanon, Ohio 45345
        Attorney for Plaintiff-Appellee

ANTHONY R. CICERO, Atty. Reg. #0065408, The Cicero Law Office, LLC, 500 East Fifth
Street, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1}   Defendant-appellant Kevin Kuritar appeals from his conviction and

sentence, following a jury trial, of Sexual Imposition, in violation of R.C. 2907.06(A)(1). Kuritar contends that his conviction is not supported by the evidence in the record, is against the manifest weight of the evidence, and is based on the testimony of the alleged victim, without the corroboration required by R.C. 2907.06(B). Kuritar, who was classified as a Tier I sex offender, also contends that the trial court erred by failing to make a determination whether he was exempt from classification under R.C. 2950.01(B)(2) because his offense involved consensual sexual contact.

{¶ 2} We conclude that Kuritar's conviction is supported by the evidence in the record, and is not against the manifest weight of the evidence. We also conclude that Kuritar's oral and written statements, which were admitted in evidence, provide ample corroboration of the victim's testimony. Finally, we conclude that Kuritar was not entitled to a separate determination of whether the sexual contact in this case was consensual. An element of Kuritar's offense is that he knew the sexual contact was offensive to the victim, or was reckless in that regard. If his victim had consented to the sexual contact, Kuritar could not have known that the sexual contact was offensive, or have been reckless in that regard. Therefore, lack of consent is implicit in the definition of the offense of which Kuritar was convicted.

{¶ 3} Accordingly, the judgment of the trial court is Affirmed.

## I. A Night of Beer Pong and Flip-Cup, Followed by Unwanted Sexual Groping

{¶ 4} The alleged victim, Cassie J., (the victim) went to the residence of a recent acquaintance, Cassie Griffin, for a "girl's night." The victim was 22. Griffin was 24.

Griffin lived in a two-bedroom duplex with her son, who was four or five years old. The victim arrived about 9:00 in the evening, in early September, 2010.

{¶ 5} Some time between 10:30 and 11:00, the two women began watching a movie, which lasted about an hour and a half. During this time, they each consumed half a beer.

{¶ 6} Griffin decided to call her new boyfriend to come over and play beer pong with them.[1] Nothing was said about anyone else coming to the house; beer pong can be played with just three players;[2] and the victim, who was dressed in gym clothes, did not anticipate that anyone else would arrive.

{¶ 7} When Griffin's new boyfriend, Aaron, arrived, Kuritar was with him. They arrived between 2:30 and 3:00 in the morning. Before then, the victim and Griffin had been playing beer pong together. The victim consumed two or three beers during this time.

{¶ 8} Although Griffin wanted the victim to flirt with Kuritar, the victim had no interest in Kuritar. She did not think Kuritar was "someone to date," and was not looking for a boyfriend at that time.

{¶ 9} The first game of beer pong was played with the women on one side, and the men on the other. In the next game, the victim was teamed with Kuritar. According to the victim, Griffin persuaded her to ask Kuritar if she could see his "abs." But according to Kuritar's oral statement to the police, it was Griffin who asked to see his abs.

---

[1] The trial court sustained an objection to a question asking for an explanation of how beer pong is played, The author has satisfied his curiosity by conducting an inquiry, but strictly outside the record. The nature of the game is immaterial to this appeal.

[2] This fact was established in the record.

{¶ 10} Both the victim and Kuritar agree that there was no flirtation between them, and no physical contact, other than one "high-five" exchanged when they were playing beer pong as a team. Conversation was always general. The victim and Kuritar had no separate conversation.

{¶ 11} From time to time, the party would step outside so that Griffin could smoke a cigarette. When they returned from having gone outside after the second beer pong game, they played a game of "flip-cup," the nature of which was not explained during the trial.

{¶ 12} All told, the victim consumed four or five, or possibly six, beers, but she testified that she was not intoxicated. She was tired, and she told Griffin that she was ready to retire to bed. Griffin told the victim that she was going to see if "the boys" were leaving. Griffin told the victim that she wanted Aaron to stay, but that since Kuritar had bought Aaron in his car, Aaron would have to leave if Kuritar left. Griffin told the victim that Kuritar had said "that he didn't want to sleep alone." To this remark the victim responded that Kuritar "would have to sleep alone whether he stayed there or went home."

{¶ 13} Griffin had made a bed for the victim on the floor at the end of Griffin's bed, in one of the bedrooms. At about 4:00 in the morning, the victim laid down and went to sleep.

{¶ 14} The victim woke up at about 6:00 in the morning to the experience of someone, later identified as Kuritar, touching her breast under her sports bra. She described this as "a grab like fondling, grabbing," and "like a squeezing rubbing."

{¶ 15} The victim said nothing, but turned from lying on her back to her side, away from Kuritar. Kuritar then moved his hand down to the inside of the victim's legs. At first,

Kuritar's hand was outside her clothing, but then he pulled down her pants and underwear, all the way to her ankles, and rubbed her vagina with his fingers. Kuritar did not penetrate the victim's vagina.

{¶ 16} Right after this, the monitor to Griffin's son's room went off, and Griffin, who was in her bed, got up to get her son. The victim looked to her left, saw Kuritar, and said "my F'ing pants are down." The victim pulled her pants up, went out into the living room, grabbed her purse and sweater, and left. Before this, no words had been exchanged during this entire incident, which lasted about five minutes. Although the victim never told Kuritar to stop, she had not given him "any indication that [she was] receptive to this." The victim testified that she froze because:

> I guess I was afraid of what might have happened if I were to have moved or did something different. I don't know. I just remember being scared and almost like I was so scared my body just tensed up and I – like I couldn't think.

{¶ 17} The victim drove to her mother's house and told her mother what had happened. Her mother persuaded the victim to go to a hospital. A police officer talked to her there. The victim talked to another police officer a couple days later. The victim testified that she found Kuritar's touching of her offensive.

{¶ 18} Kuritar gave both an oral statement and a written statement to the investigating police officer. Both were admitted in evidence. In his oral statement he ultimately admitted to having touched the victim in the manner the victim described. In fact, his account of the incident was the same as the victim's account, with the exception that he said that it was Griffin, not the victim, who had asked to see his abs. He acknowledged that

there had been no flirtation, kissing, or hugging between himself and the victim before he touched her.

**{¶ 19}** Kuritar's written statement, in his own handwriting, included the following: "From there I started to fool around but would stop occasionaly [sic] knowing I shouldn't be doing this but with the help of beer still in my system my thought process turned into well she can always say no or tell me to go away."

## II. The Course of Proceedings

**{¶ 20}** Kuritar was charged by complaint with two counts of Sexual Imposition, in violation of R.C. 2907.06(A)(1), misdemeanors of the third degree. One count was for the touching of the victim's breast; the other was for the touching of her vagina.

**{¶ 21}** Following a jury trial, Kuritar was convicted of the count involving the victim's breast, but acquitted of the count involving her vagina. Kuritar was sentenced to 90 days in jail, suspended, and community control for one year. He was fined $25, and ordered to pay court costs in the amount of $565. Finally, he was classified as a Tier I sex offender.

**{¶ 22}** From his conviction, sentence, and sex offender classification, Kuritar appeals.

## III. Kuritar's Conviction Is Supported by the Evidence, and Is Not Against the Manifest Weight of the Evidence

**{¶ 23}** Kuritar's Second Assignment of Error is as follows:

THE JURY VERDICT SHOULD BE REVERSED BECAUSE THERE IS

INSUFFICIENT EVIDENCE TO WARRANT A CONVICTION, AND THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 24}** The evidence of Kuritar's guilt is ample, if not overwhelming.

**{¶ 25}** Kuritar does not dispute that he touched the victim's breast, which is sexual contact as defined in R.C. 2907.01(B). He disputes that there is sufficient evidence that he either knew that his conduct was offensive, or was reckless in that regard.

**{¶ 26}** Kuritar admitted in his oral statement to the investigating police officer that there had been no flirtation, hugging or kissing between himself and the victim before he touched her. Nor, according to the victim, had there been any intimate conversation between the two, who had never previously met. She testified that they had not engaged in conversation separate from the general conversation between and among the four people in Griffin's home.

**{¶ 27}** The victim retired to Griffin's bedroom to sleep, and had been sleeping for two hours when she was suddenly awakened to Kuritar's touching her breast under her bra.

**{¶ 28}** The venue, and the drinking games, could have been appropriate to flirtation leading up to sexual activity. But there is no indication in this record that any flirtation occurred, or that anything occurred that would have led Kuritar to conclude that his touching the breast of a sleeping woman, whom he had just met that night, and with no history of expressed sexual interest between them, would be less than offensive.

**{¶ 29}** Furthermore, Kuritar's written statement: "knowing that I shouldn't be doing this," creates a strong inference – certainly a reasonable one – that he knew that his touching the victim's breast would be offensive to her.

**{¶ 30}** The evidence in this record is sufficient to support Kuritar's conviction. The

inference that he knew his touching of the victim's breast would be offensive to her is reasonable, and there are no material conflicts between the victim's testimony and Kuritar's account of the incident that would prevent a reasonable jury from crediting the victim's testimony. This is not the exceptional case where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); quoted in *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶ 31}  Kuritar's Second Assignment of Error is overruled.

## IV.  Kuritar's Oral and Written Statements to the Investigating Police Officer Constitute Ample Corroboration of the Victim's Testimony

{¶ 32}  Kuritar's First Assignment of Error is as follows:

KEVIN KURITAR WAS CONVICTED IN THE ABSENCE OF CORROBORATING EVIDENCE REQUIRED BY R.C. §2907.06(B).

{¶ 33}  R.C. 2907.06(B) provides that: "No person shall be convicted of a violation of this section [Sexual Imposition] solely upon the victim's testimony unsupported by other evidence."

{¶ 34}  Kuritar contends that there is no evidence that he knew that his conduct would be offensive to the victim, or that he was reckless in this regard, other than the victim's testimony, so that his conviction is barred by the requirement of corroboration found in R.C. 2907.06(B). But Kuritar's oral and written statements to the investigating police officer, which were admitted in evidence without objection, corroborate all of the victim's testimony supporting a conclusion that Kuritar knew his conduct would be offensive to her, or was

reckless in that regard. These circumstances include the facts that there had been no prior flirtatious activity between Kuritar and the victim, no hugging or kissing, no intimate conversation, nothing to indicate that a sexual contact would be other than unwelcome, and the fact that the victim had retired to Griffin's bedroom to sleep, and had been sleeping for at least two hours when Kuritar entered the bedroom and groped her breast.

{¶ 35} In fact, Kuritar's written statement does more than just corroborate these facts, which by themselves support a reasonable inference that he knew his conduct would be offensive to the victim; in it, he writes that he knew that he shouldn't be doing what he was doing.

{¶ 36} Kuritar argues that there is no corroboration of the victim's testimony that his touching of her breast was, in fact, offensive to her. Although R.C. 2907.06(A)(1) does not expressly include, as an element of the offense, that the sexual contact is offensive to the victim, we agree with Kuritar that this is an implicit element of the offense. To some extent, Kuritar's written statement corroborates that his victim found the sexual contact offensive. In that written statement, Kuritar writes: "When I heard [Griffin's] son start to wake up I stopped everything and started to roll over on my back and then [the victim] sat up and stormed out the door." If this is not sufficient corroboration, then there can never be a successful prosecution for a violation R.C. 2907.06(A)(1). There is no way to corroborate a victim's testimony that she was, in fact, offended by a sexual contact. Only the victim has access to that fact.

{¶ 37} But even if there were no independent corroboration of a victim's testimony that a sexual contact was offensive to the victim, we do not conclude that corroboration of that particular element of the offense is required, when the victim's testimony as to all other

elements has been corroborated. *State v. Rossi*, 2d Dist. Montgomery No. 22803, 2009-Ohio-1963, ¶ 37-39.

{¶ 38} Kuritar's First Assignment of Error is overruled.

### V. Because Lack of Consent Is Implicit in R.C. 2907.06(A)(1), the Trial Court Was Not Required to Make a Separate Determination of Lack of Consent Before Classifying Kuritar as a Tier I Sex Offender

{¶ 39} Kuritar's Third Assignment of Error is as follows:

THE TRIAL COURT ERRED BY INCORRECTLY LABELLING [sic] KEVIN KURITAR A "SEX OFFENDER" AND SUBJECTING HIM TO ALL OF THE REGISTRATION AND NOTIFICATION PROVISIONS WITHOUT FIRST DETERMINING THE APPLICABILITY OF R.C. §2950.01(B)(2)[,] WHICH EXEMPTS CERTAIN CONVICTIONS.

{¶ 40} Kuritar relies upon R.C. 2950.01(B)(2), which, at the time of Kuritar's offense, provided, in pertinent part, as follows:

"Sex offender" does not include a person who is convicted * * * of a sexually oriented offense if the offense involves consensual sexual conduct or consensual sexual contact and either of the following applies:

(a) The victim of the sexually oriented offense was eighteen years of age or older and at the time of the sexually oriented offense was not under the custodial authority of the person who is convicted of * * * the sexually oriented offense.

(b) The victim of the offense was thirteen years of age or older, and the person who

was convicted of * * * the sexually oriented offense is not more than four years older than the victim.

**{¶ 41}** Both subdivisions (a) and (b) of the statute apply, since Kuritar and his victim were both 22 years old at the time of the offense. Therefore, Kuritar is not a "sex offender" for the purposes of sex offender classification, registration, and notification requirements, if the offense involved consensual sexual contact.

**{¶ 42}** Kuritar relies upon *State v. Raber*, 9th Dist. Wayne No. 10CA0020, 2011-Ohio-3888; and *State v. Metzger*, 11th Dist. Portage No. 2010-P-0077, 2011-Ohio-2749, for the proposition that the trial court was required to make a determination that the sexual contact in his case was not consensual before he could be classified as a Tier I sex offender. We do not construe either case as supporting that proposition.

**{¶ 43}** In *State v. Metzger*, the defendant was convicted of Unlawful Sexual Conduct with a Minor, in violation of R.C. 2907.04(A). *Id.* at ¶ 3. Lack of consent was not required for that conviction. *Id.* at ¶ 24.

**{¶ 44}** In *State v. Raber*, whether the offense in that case – only described at ¶ 2 as "sexual imposition" – required lack of consent was not discussed, and was not an issue on appeal. At issue in the appeal was whether the trial court had jurisdiction to hold a hearing on whether the sexual contact involved was consensual after the judgment of conviction and sentence. The court of appeals held that it did. *Id.* at ¶ 8. Also at issue was the similar issue of whether the subsequent determination by the trial court that the sexual contact in that case was not consensual violated the constitutional Double Jeopardy clause. The court of appeals held that this issue had been waived. *Id.* at ¶ 10.

{¶ 45}   In the case before us, Kuritar was convicted under R.C. 2907.06(A)(1).   A conviction under this section requires a finding that the offender knows that the sexual contact is offensive to the victim, or is reckless in this regard.   If the sexual contact were consensual – i.e., the victim consented to it – then the defendant could not have known that the sexual contact was offensive to the victim, or been reckless in that regard.   If the victim consented to the contact, the defendant would have no reason to believe that it would be offensive to the victim.   Therefore, implicit in the definition of Sexual Imposition under R.C. 2907.06(A)(1) is that the sexual contact is not consensual.   Properly instructed, a reasonable jury could not return a verdict of guilty under R.C. 2907.06(A)(1) for consensual sexual contact.

{¶ 46}   Because a finding that Kuritar's sexual contact with his victim was consensual would be incompatible with the jury's verdict, there was no need for a separate determination of lack of consent by the trial court.

{¶ 47}   We also note that when Kuritar was sentenced and classified as a Tier I sex offender, almost a month after the jury verdict, neither he nor his counsel objected to his classification, or otherwise asserted that a determination of lack of consent was a required predicate for that classification.

{¶ 48}   Kuritar's Third Assignment of Error is overruled.


## VI.   Conclusion

{¶ 49}   All of Kuritar's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

FROELICH and RICE, JJ., concur.

(Hon. Cynthia W. Rice, Eleventh District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Ryan Brunk
Anthony R. Cicero
Hon. James A. Hensley, Jr.